UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAZAQ, et al.,

      Petitioners,

  v.

CHRISTINA POULOS, et al.
      Respondents.
_____/

No. C 06-2461 WDB

ORDER AND MEMORANDUM
OPINION RE MOTIONS FOR
SUMMARY JUDGMENT

## **INTRODUCTION**

For reasons we will explain in the pages that follow, we DENY, for now, Petitioners' Motion for Summary Judgment, filed November 8, 2006, seeking Writ of Mandamus.  As explained, *infra*, we also DENY Respondents' "Cross Motion" for Summary Judgment, filed November 22, 2006.  The Court retains jurisdiction over this action, however, and invites petitioners to file an amended motion for summary judgment after February 5, 2007, if the government has failed to keep its promise to resolve petitioner Holly Razaq's outstanding I-130 application by that date.

These proceedings began on April 7, 2006, when petitioners Holly Ann Weber Razaq and Assad Razaq filed a Petition for Writ of Mandamus asking the Court to compel the United States Citizen and Immigration Services ("USCIS") to *process* Holly Razaq's I-130 petition to obtain "immediate relative" status for her husband, Assad Razaq.[1]

---

[1]Petitioners filed an Amended Petition for Writ of Mandamus on April 18, 2006.  That document is the operative pleading.

1       Petitioner Assad Razaq is a native of Kenya and is a citizen of the United

2   Kingdom.  Declaration of Stacey L. Gartland in Support of Petition for Writ of

3   Mandamus, filed April 18, 2006, ("Gartland Decl."), at Ex. A.  He entered the United

4   States on a 90-day tourist visa in March of 1997.  Declaration of Ronald E. Johnson,

5   filed November 22, 2006, ("Johnson Decl.") at ¶7.  He married a woman (not Ms.

6   Weber) who was a citizen of the United States and who, sometime near the end of the

7   decade, submitted an application on Form I-130 seeking a determination of

8   "immediate relative" status for Mr. Razaq that would enable him to apply for an

9   "immigrant" (permanent) visa.  Gartland Decl., at Ex. F.[2]  She withdrew that

10  application in 2001, after she and Mr. Razaq were divorced.  *Id*.

11      In 2001 Mr. Razaq met Ms. Weber.  Gartland Decl., at Ex. F.  In 2002 the

12  immigration authorities determined that Mr. Razaq was in this country illegally --

13  having overstayed his 90-day tourist visa by some five years.  *Id*.; Johnson Decl., at

14  ¶7.  He was taken into custody -- then elected to leave the country rather than litigate

15  his status.  Gartland Decl., at Ex. F.  In July of 2004 he and Ms. Weber were married

16  in Antigua.  Gartland Decl., at Ex. A.  In September of that year she submitted an

17  application on Form I-130, asking that her marriage to Mr. Razaq be deemed valid so

18  that he could apply for a permanent visa and re-enter the United States.  Gartland

19  Decl., at Ex. A.  Even though more than two years has elapsed since the current Ms.

20  Razaq filed this second I-130 application, the USCIS has not completed adjudicating

21  Ms. Razaq's application.  It is petitioners' position that the USCIS has unreasonably

22  (and, therefore, unlawfully) delayed the processing of Ms. Razaq's application.

23      The USCIS filed its answer to petitioners' complaint in these proceedings on

24  June 7, 2006.  Thereafter, the parties entered two successive stipulations to continue

25  the initial case management conference in the hope that the administrative

26

27      [2]Some of the background factual information herein is derived from a report written by
28  Lisa Bonta Sumii, the social worker who conducted a mental health assessment of Holly Razaq.
Declaration of Stacey L. Gartland in Support of Petition for Writ of Mandamus, filed April 18,
2006 ("Gartland Decl."), at Ex. F.  We presume the information in the report was told to the
social worked by Ms. Razaq.  As neither party has disputed the accuracy of the social worker's
statements, for our purposes here, we accept these representations as accurate.

2

1   proceedings were about to be concluded.  Stipulations, filed June 28, 2006, and

2   August 16, 2006.  When that hope proved illusory, petitioners filed a motion for

3   summary judgment, to which the government responded by filing an opposition and a

4   cross motion for summary judgment.  On November 8, 2006, the Court scheduled a

5   hearing on these cross motions for December 13, 2006.

6          On December 7, 2006, after both motions for summary judgment had been

7   fully briefed, the government notified the court and petitioners that it had decided that

8   it would adjudicate Ms. Razaq's I-130 application within sixty days.  Respondents'

9   Sur-Reply, filed December 7, 2006.  Having been so notified, the Court vacated the

10  December 13th hearing on the cross motions for summary judgment.  Rather than

11  dismiss the action, however, the Court scheduled a case management conference for

12  February 21, 2007 -- so the Court could re-set the hearing on the motions if the

13  government failed to honor its promise.  Petitioners were unhappy with this proposed

14  course of action.  They filed an Objection to the Court's Order and asked the Court to

15  issue a formal ruling on their Motion.  We agreed to do so.  See, Order, filed

16  December 12, 2006.

17         The parties' motions present two issues.  First, we must decide whether the

18  Court has jurisdiction over the Razaqs' Petition for Writ of Mandamus.  If the Court

19  has jurisdiction over this matter, we must consider the merits of the parties' motions.

20

21                          **DISCUSSION**

22  **I.      Jurisdiction over the Petition for Writ of Mandate**

23         The government contends that the Court lacks jurisdiction over the Razaqs'

24  Petition for Writ of Mandamus.

25         Petitioners filed their Petition for Writ of Mandamus pursuant to the

26  Mandamus and Venue Act, 28 U.S.C. §1361 ("Mandamus Act"), and the

27  Administrative Procedures Act, 5 U.S.C. §§555, 702 and 706 ("APA").

28  //

    //

1    The Mandamus Act provides:

2    The district court shall have original jurisdiction of any action in the
     nature of mandamus to compel an officer or employee of the United
3    States or any agency thereof to perform a duty owed to the plaintiff.

4    28 U.S.C. §1361.

5         In circumstances such as those presented here, a district court has jurisdiction

6    to consider whether to issue a writ of mandamus under this statute if the action that

7    the petitioners ask the Court to compel the agency to take is the kind of action that

8    Congress and the courts have recognized as appropriate for mandamus relief. *E.g.,*

9    *Rios v. Ziglar*, 398 F.3d 1201 (10th Cir. 2005).  To be so recognized, the action that

10   the petitioner seeks to compel must be deemed ministerial and non-discretionary. *Id*.

11   *Accord, Patel v. Reno*, 134 F.3d 929, 931-2 (9th Cir. 1998).

12        The government contends that the duty petitioners seek to compel is not

13   "ministerial" because neither Congress nor the regulations have specified a time limit

14   in which the agency must act.  Opposition at 3.  For the reasons set forth in this

15   section, we FIND that the act that petitioners seek to compel is ministerial and,

16   therefore, that the Court has jurisdiction to consider whether to issue the writ that

17   petitioners seek.

18        Petitioners are not asking the Court to dictate the outcome of the administrative

19   proceedings.  Instead, they are simply asking the Court to order the executive branch

20   to complete -- in an appropriate period -- the processing of their application.  The

21   Court is not being asked to dictate the substance of the decision -- just to force the

22   defendant to decide.

23        The Immigration and Nationality Act ("INA") provides that,

24   After an investigation of the facts in each case, . . . the Attorney General
     shall, if he determines that the facts stated in the petition are true and that
25   the alien in [sic] behalf of whom the petition is made is an immediate
     relative, . . . approve the petition and forward one copy thereof to the
26   Department of State.  The Secretary of State shall then authorize the
     consular officer concerned to grant the preference status.
27
28   8 U.S.C. §1154(b) (emphasis added).  The statute uses the term "shall," expressly
     requiring the agency to approve an I-130 application where the predicate for

4

1    obtaining I-130 status has been satisfied.[3]  Congress clearly contemplates that an

2    investigation will be conducted and a decision rendered.

3         This obvious Congressional intent is implicitly acknowledged in the language

4    of pertinent regulations.  See, e.g., 8 C.F.R. §204.2(a)(3) ("the approved petition will

5    be . . .." and "[i]f the petition is denied . . ." emphasis added).

6         Thus, the INA and the regulations issued pursuant to it impose on the executive

7    branch a clear duty to either grant or deny petitioner's I-130 petition.  The agency is

8    not authorized to hold onto the petition and make no decision.  *But compare*, *Luo v.*

9    *Coultice*, 178 F.Supp.2d 1135 (C.D.Cal 2001) ("court does not find any statutory

10   language obligating the INS to approve or reject petitions returned by consulate").

11   We find that the USCIS has a mandatory duty to decide whether to grant or deny I-

12   130 petitions.  *Accord, Patel*, 134 F.3d 929 (consul cannot suspend visa application);

13   *Aboushaban v. Mueller*, 2006 WL 3041086 (N.D. Cal) (agency has duty to adjudicate

14   I-485 application); *Yu v. Brown*, 36 F.Supp.2d 922 (D.N.M. 1999).

15        The fact that neither the statute nor the regulations establish a specific deadline

16   does *not* change the character of the duty itself.  While the substance of the decision

17   whether to grant or deny a petition obviously is discretionary, the duty to process the

18   application is just as obviously ministerial.  Congress expected the executive branch

19   to receive applications of this kind and then to 'adjudicate' them to a decision.

20        It is equally clear that Congress had to have intended the executive branch to

21   complete these 'adjudications' within a reasonable time -- because imposing no time

22   constraint at all on the executive branch would be tantamount to giving the

23

---

24        [3]At this juncture, we make no findings with respect to petitioners' argument that, pursuant
     to *Matter of O*, 8 I & N Dec. 295 (BIA), "law enforcement and national security concerns are
25   entirely irrelevant to adjudication of the [I-130] petition." Reply, at 7 (emphasis added).  In our
     view, it seems unlikely that the ability of the USCIS to consider national security concerns is
26   entirely cut off.  First, if the agency's investigation were to uncover evidence of unlawful
     activity, that evidence might call into question the credibility of statements made in the I-130
27   petition and thus affect the agency's assessment of their "truth."  Moreover, under petitioners'
     view, the agency would be required to grant an I-130 application on behalf of a known terrorist
28   if his or her marriage to a U.S. citizen were "legitimate."  Because it appears that "immediate
     relative" status might entitle an alien to a temporary visa and thus entry into this country, we
     question petitioners' view that national security concerns are "entirely irrelevant" to the USCIS's
     assessment of the validity of an applicant's I-130 petition.

5

1    government the power to decide whether it would decide.  If Congress had wanted to
2    give the executive branch that power, the power to decide whether to decide, it would
3    have been obvious to Congress how to articulate that intention.  But Congress
4    followed no such course.  Instead, by using the phrase of legal art "shall," Congress
5    ordered the executive branch to make decisions on these applications.  Congress
6    would have eviscerated that mandate (ordering the executive branch to make a
7    decision) if it had given the executive branch full discretion to determine the time
8    frame for concluding the processing of the applications.  A 'duty to decide' becomes
9    no duty at all if it is accompanied by unchecked power to decide when to decide.

10       Congress imposes many duties on executive agencies without prescribing
11   specific time frames for their completion.  This is a wise course -- as Congress
12   recognizes that in many instances it will not have sufficient information to impose
13   deadlines that adequately take into account a host of potentially relevant variables.
14   Recognizing that there will be instances in which it would be unwise to impose rigid
15   deadlines on agencies dealing with a wide variety of circumstances, many not fully
16   predictable, Congress enacted a generally applicable prescription that would offer
17   agencies the time they legitimately needed to complete their assigned tasks but that
18   would not permit those agencies to evade their duties altogether by retreating
19   indefinitely into inaction.  This prescription applies, through the Administrative
20   Procedure Act, when Congress imposes a duty but does not articulate a specific time
21   frame within which that duty must be honored.

22       Section 555(b) of the APA states, " . . . With due regard for the convenience
23   and necessity of the parties or their representatives, and within a reasonable time,
24   each agency shall proceed to conclude a matter presented to it."  Emphasis added.
25   Similarly, section 706 of the APA states,

26          To the extent necessary to decision and when presented, the reviewing
            court shall decide all relevant questions of law, interpret constitutional
27          and statutory provisions, and determine the meaning or applicability of
            the terms of an agency action.  The reviewing court shall – (1) compel
28          agency action unlawfully withheld or unreasonably delayed, . . .

     5 U.S.C. §706 (emphasis added).

1    Thus, where a statute does not specify a deadline for a particular kind of

2    government action, the APA compels the executive agency to act "within a

3    reasonable time." *Accord, Patel*, 134 F.3d 929 (no time frame specified; court finds

4    eight year delay unreasonable); *Fallini v. Hodel*, 783 F.2d 1343 (9th Cir. 1986) (BLM

5    must remove wild horses from private land within a reasonable time where Wild

6    Horses Act specifies no time frame).

7    Consistent with these authorities, we reject respondents' argument that the

8    absence of a statutorily specified deadline, by itself, changes the character of the

9    government's duty from ministerial to discretionary.  The duty that the petitioners

10   want this Court to compel the government to honor is the duty to make a decision -- a

11   duty that can be real only if it must be honored sometime.  Here, Congress has made

12   the duty it has imposed real by ordering the executive branch to make its decision on

13   petitioners' application "within a reasonable time."

14   For all the reasons set forth above, we conclude that this Court may exercise

15   jurisdiction over petitioners' request for a writ of mandamus.

16

17   **II.    Parties' Motions for Summary Judgment**

18   To succeed on a motion for summary judgment, the moving party must

19   establish that, under facts that are not subject to genuine dispute, that party is entitled

20   to judgment as a matter of law.  Federal Rule of Civil Procedure 56(c).  In reviewing

21   a motion for summary judgment, the Court considers the evidence in the light most

22   favorable to the party against whom the judgment is sought.

23   We must grant the motion for summary judgment if, when we consider the

24   evidence in the best possible light for the party against whom the judgment is sought,

25   the evidence is sufficient (as a matter of law) to support a finding that the moving

26   party has proved all required elements of the party's claims.

27   //
     //

28   //
     //

7

**A.    Petitioners' Motion**

To be entitled to issuance of a writ of mandamus, petitioners must demonstrate that: (1) their claim is clear and certain, (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available. *Fallini*, 783 F.2d 1343; *Patel,* 134 F.3d 929.

In section I, *supra*, we explained the basis for our finding that respondents have a nondiscretionary, ministerial duty to adjudicate petitioner's Form I-130 application. Thus, the second requirement for issuance of a writ of mandamus is satisfied.

Respondents have not suggested that a remedy other than mandamus would be available and adequate to enforce the rights asserted here by petitioners.

It follows that the only requirement for issuance of a writ of mandamus that remains for petitioners to satisfy is the requirement that they establish that their claim is clear and certain. As we understand it, this means that petitioners must clearly demonstrate their entitlement to the requested relief. We now turn to this issue.

Immigration-based complaints such as the Razaqs', which seek to compel the government to decide a petition pending before it (but not to compel any particular decision), will satisfy the requirements for obtaining mandamus where the petitioner demonstrates that the agency has unreasonably delayed. *Patel*, 134 F.3d 929 (consul cannot suspend visa application; eight year delay unreasonable); *Aboushaban*, 2006 WL 3041086 (agency has duty to adjudicate I-485 application within reasonable period; ten year delay unreasonable). Accordingly, we may grant petitioners' Motion to obtain mandamus only if facts that are not subject to genuine dispute, when considered in the light most favorable to the government, demonstrate, <u>as a matter of law</u>, that the government has "unreasonably delayed" processing of Ms. Razaq's I-130 application.

By their Motion for Summary Judgment, petitioners assert that they have demonstrated, as a matter of law, that the government has unreasonably delayed processing Ms. Razaq's I-130 application. They ask the Court to issue a writ of mandamus compelling the USCIS to adjudicate the I-130 application within sixty

1    days.[4]  In response, the government asserts not only that petitioners have failed to

2    show that the USCIS has acted unreasonably, but also that the Court should make the

3    opposite finding -- *i.e.*, respondents ask us to find, as a matter of law, that the

4    government has acted *reasonably*.

5         Mandamus is an extraordinary remedy.  *Patel*, 134 F.3d at 931.  The mandamus

6    remedy implicates fundamental constitutional principles that dictate the separation of

7    governmental powers and that strive to preserve in substantial measure the

8    independence of each of the three great branches of our government.  These

9    fundamental constitutional directives require courts to proceed with considerable care

10   and caution when asked to use the power of mandamus to impose a course of conduct

11   on an executive agency.  Given the magnitude and sensitivity of these constitutional

12   principles, courts must resolve close questions about whether to issue a writ in favor

13   of the government.  Thus, the delay that petitioners must establish to justify issuance

14   of the writ must be clearly unreasonable.  Moreover, courts may not rely on facts that

15   are subject to genuine dispute to justify issuing a writ of this kind -- and must

16   consider the facts that are not subject to genuine dispute in the light most favorable to

17   the government.  Among other things, this means that if multiple inferences could

18   rationally be drawn from a given set of undisputed facts, the court (in deciding

19   whether to issue a writ of this kind) must draw the inference that is most favorable to

20   the government.  Stated differently, in this procedural setting, if an inference that

21   would be favorable to the government could rationally be drawn from the evidence,

22   the court must draw that inference.

23        The parties have given us little guidance about how to determine whether the

24   "delay" between September 13, 2004, (the date Ms. Razaq filed her I-130 application)

25   and the present is "clearly unreasonable."  Petitioners' papers suggest that the period

26

27   _____

28   [4]Petitioners originally requested an order compelling adjudication within thirty days.
     Motion at 7.  The government has since agreed to adjudicate the application by February 5, 2007,
     and petitioners do not object to use of this deadline.  Declaration of Anna K. Chau, filed
     December 7, 2006; Petitioners' Objection to Court's December 8, 2006 Order, filed December
     11, 2006.

9

1  of delay by itself -- more than two years -- should be deemed sufficient to establish a

2  violation of the duty to process the application within a reasonable period.   The only

3  significant point petitioners make to bolster this argument is that, as of April 18,

4  2006, information on the government's public website indicated that the USCIS was

5  then processing I-130 applications filed one year after Ms. Razaq's.  Gartland Decl.,

6  at Ex. B.

7       On the other hand, the only acts by the agency that respondents cite in support

8  of their position were taken after the petitioners' application had been pending for

9  some twenty two months.  The government also alludes at the most general of levels

10  to some unspecified national security concerns.  Opposition at 4.

11       Where the governing statute specifies no deadline for a governmental act, the

12  Ninth Circuit has considered the following factors -- known as the "TRAC factors"[5] --

13  to assist in assessing whether a government agency has unreasonably delayed

14  concluding a matter before it in violation of the APA:

15    (1) the time agencies take to make the decision must be governed by a
    "rule of reason" (2) where Congress has provided a timetable or other
16    indication of the speed with which it expects the agency to proceed in
    the enabling statute, that statutory scheme may supply content for this
17    rule of reason, (3) delays that might be reasonable in the sphere of
    economic regulation are less tolerable when human health and welfare
18    are at stake, (4) the court should consider the effect of expediting
    delayed action on agency activities of a higher or competing priority, (5)
19    the court should also take into account the nature and extent of the
    interests prejudiced by the delay, and (6) the court need not "find any
20    impropriety lurking behind agency lassitude in order to hold that agency
    action is unreasonably delayed."

21
22  *Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, n. 7 (9th Cir. 1997) (agency

23  processing of application for mineral patents).  See also, *Brower v. Evans*, 257 F.3d

24  1058 (9th Cir. 2001) (balancing TRAC factors to determine whether agency

25  unreasonably delayed); *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, n.

26
27
28

[5]So named for *T.R.A.C. v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984).

1   11 (9th Cir. 2002) (courts use TRAC factors where there is no deadline from
2   Congress in order to evaluate reasonableness of delay).[6]

3         This non-exhaustive list of considerations must be applied in specific factual
4   settings; courts must decide whether a petitioner has shown that a delay was "clearly
5   unreasonable" on a case-by-case basis -- taking fully into account all the variables
6   and considerations at play in each specific factual/historical scenario. *Fallini*, 783
7   F.2d at 1347; *Selah v. Ridge*, 367 F.Supp.2d 508, 512 (S.D.N.Y. 2005).   There are no
8   formulaic bases for resolving these kinds of issues; there is no particular time frame
9   that is presumptively unreasonable across the agency board.   Instead, in each case the
10  court must determine what kind of decision the applicant was asking the government
11  to make, what kind of information the government would reasonably need to acquire
12  in order make that decision responsibly, how much time it might take to gather that
13  information, whether the applicant could have provided needed information faster or
14  more reliably, what competing demands were being made on the agency during the
15  relevant period, and whether there were forces at work or barriers involved that were
16  beyond the agency's control that disabled it from getting a sufficient information base
17  to make the kind of decision it was being asked to make.

18        At the outset, we note that the third "TRAC" factor provides that delays
19  involving human welfare are less tolerable than those that implicate only economic
20  interests, and that the fifth factor directs the court to take into account the nature and
21  extent of the interests prejudiced by the delay.  The processing of Holly Razaq's I-130
22  petition affects human health and welfare, the well-being of the Razaqs' marriage and
23  Ms. Razaq's mental health. Gartland Decl., at Ex. F.  Thus, the nature of the interests
24  implicated by the delay are potentially quite significant.  It is less clear, however, how
25  much harm to those interests the government's delay has caused.  Apparently the

---

27  [6]While none of these cases involves a petition for a writ of mandamus with respect to
    immigration applications, we see no principled basis for presuming that the Ninth Circuit would
28  reject those factors in this context. *See, Independence Mining Co., Inc., v. Babbitt*, 105 F.3d 502
    (9th Cir. 1997) (claim seeking mandamus under MVA is "in essence" one for relief under §706
    of the APA).  Additionally, we find that, substantively, the TRAC factors provide a sensible
    place to start our analysis.

petitioners have been able to spend time together outside the United States.  The agency's delay has prevented the petitioners from spending time together in the United States -- but it has not prevented them from spending time together elsewhere. So the interest that has been harmed by the delay is not the interest in being married or being together per se, but the interest in being together sooner in this country. Moreover, the Court may not presume that the government's action on Mrs. Razaq's application would be positive.  If that decision turns out be to negative, the interest that would have been harmed is the interest in knowing sooner that petitioners would have to spend their time together outside the United States.  We do not mean to suggest that these are insignificant interests, especially for a citizen of this country (as Ms. Razaq is).  We do mean to suggest, however, that we need to be careful when we try to identify the interests that really are implicated by an agency's action and when we try to gauge the extent to which the agency action appears to have harmed those interests.

    Another of the TRAC factors that we are instructed to consider focuses on the effect that ordering an agency of the executive branch to expedite applications like petitioners would have on the ability of the agency to complete tasks of comparable or higher priority. The government has given us virtually no information by which we could assess the weight of this factor.  The government has not described the backlog of similar applications or the volume of work the agency has faced.  Nor has the government identified any higher priority matters whose timely completion might be jeopardized if the agency were required to make a decision on petitioners' application within the near future.  Without explanation and without citing any evidence, the government makes only a generalized assertion that expediting the processing of applications like petitioners could compromise national security.  Opposition at 4; Johnson Decl., at ¶10.  Compare, *Luo*, 178 F.Supp.2d 1135 (no writ where government presented evidence of significant backlog and of other types of applications having higher 'priorities'); *Saleh*, 367 F.Supp.2d 508 (summary judgment for government where Congress limited number of that type of petition that

1    could be granted and processing time was consistent with published time – in light of

2    annual limit and volume of applications delay was not unreasonable).  In light of the

3    fact that the government has recently promised, without compulsion from the court, to

4    complete its processing of petitioners' application within 60 days, we infer that

5    neither the volume of competing demands nor concerns about national security

6    remain as obstacles to timely action on this application.  Declaration of Anna K.

7    Chau, filed December 7, 2006.

8            Against this backdrop, we turn to a more detailed examination of the evidence

9    about how the government has processed Ms. Razaq's I-130 application.  Given the

10   importance of the national security concerns that the government contends were

11   implicated by an application like Ms. Razaq's, the government's Opposition to the

12   petition for a writ of mandamus in this case was remarkably spare and superficial.

13   The evidence submitted by the <u>government</u> (as opposed to evidence submitted by

14   <u>petitioners</u>) establishes the following facts about the government's response to Ms.

15   Razaq's I-130 application: (1) the USCIS ran "IBIS name checks" on August 11, 2006

16   and November 18, 2006,[7] (2) at some unspecified juncture the USCIS ran a "CIS

17   database check" on Assad Razaq, and (3) the USCIS interviewed Ms. Razaq on

18   August 14, 2006, then asked her for additional information (information that she has

19   since provided).  Johnson Decl., at ¶¶7 and 9.

20           As one can readily see, the evidence to which the <u>government</u> has directed our

21   attention would *not* support an inference that it took *any* action on Ms. Razaq's

22   petition <u>before</u> August 11, 2006[8] – almost two years after she initially submitted her I-

23   130 application and four months after petitioners filed the Complaint in this action.

24   Respondents' Opposition contains <u>no</u> explanation about what, if anything, was being

25

26   _____

27       [7]Respondents' opposition notes that the agency conducted "IBIS name check inquiries"
     on March 28, 2003, and May 2, 2003.  Opposition at 2; Johnson Decl., at ¶7.  Because Ms.
     Razaq's I-130 was not filed until September 2004, these name check inquiries could not have
28   been responses to the I-130 application at issue here.

         [8]Evidence submitted by respondents would support a finding that the USCIS ran an "IBIS
     name check inquiry" on August 11, 2006.  Johnson Decl., at ¶7.

13

1   done in response to the I-130 application between September 13, 2004, and August

2   11, 2006.

3          Ironically, it is evidence that <u>petitioners</u> have submitted that indicates that the

4   government took a series of actions in response to petitioner's I-130 application

5   between September 13, 2004, and August 11, 2006.  Not long after filing her I-130

6   application, Ms. Razaq initiated a series of e-mail exchanges with the USCIS --

7   checking on the status of her application and offering to provide additional

8   information the government might need.  Gartland Decl., at Ex. C.  Petitioners'

9   evidence includes copies of e-mail responses from the agency.[9]  The parties' e-mail

10  exchanges support the following conclusions.  (1) As of January 26, 2005 (about four

11  months after the application was filed), Ms. Razaq's I-130 was "in transit to the

12  responsible division for review and processing."  (2) As of March 18, 2005, the case

13  was "currently undergoing additional systems check."  The agency directed

14  petitioners to allow an additional 180 days for processing.[10]  (3) As of April 12, 2005,

15  the case was sent "to an Adjudicating officer in line for adjudication."  (4) As of June

16  9, 2005, the agency had "<u>selected this case for detailed review and inquiry</u>."  The

17  agency indicated at this juncture that because of the referral of the application for

18  more detailed analysis, "<u>this will take longer than the normal processing time</u>."

19  (Emphasis added).  (5) On July 11, 2005, the agency repeated the response it had

20  given on June 9th.  (6) As of November 9, 2005, petitioners had complied with a

21  request for information from the FBI.[11]  (7) As of November 14, 2005, the agency

22  contact was waiting for review to be completed (presumably by the FBI) and for "the

23  file ... [to be] released back to our office for adjudication."

---

[9]The authenticity of these responses is undisputed.

[10]The record does not include an explanation of the subject matter of a "systems check."
The additional 180 days would have expired about September 18, 200<u>5</u>.

[11]This statement was made in an e-mail from petitioners' counsel.  It, and counsel's March
9, 2006, statement that, "[t]he couple [has] complied with all security investigations requested
of them" (Gartland Decl., at Ex. D), clearly vitiate the credibility of petitioners' later statement
that "[i]t appears that Respondents had taken absolutely no action on the I-130 visa petition prior
to Petitioners filing their mandamus petition."  Reply at 6.

This record, when viewed in the light most favorable to the government, could support a series of inferences under which the Court could not find, as a matter of law, that the time the government took to complete its processing of Ms. Razaq's I-130 application -- through the end of 2006 -- was "clearly unreasonable."

The first such inference supported by the record is that between September 13, 2004, and March 18, 2005, the USCIS had begun its review of Ms. Razaq's application and had learned enough to warn Ms. Razaq that processing her form I-130 would take an additional 180 days.  The evidence also could support a finding that by June 9, 2005, the USCIS had completed one level of screening and analysis of petitioner's I-130 application, a process that included more than one systems check and an examination by an adjudicating officer, and, based on the information that had been developed, the agency had determined that it was appropriate to subject Ms. Razaq's application to a more exacting "detailed review."  Gartland Decl., at Ex. C (e-mail from respondents to Jessica Gonzalez, dated June 9, 2005).

While there is evidence that suggests that during this first nine month period (before the referral of the application for the more exacting review) the USCIS was not processing Ms. Razaq's application as quickly as it was processing some others,[12] we certainly cannot assume that all applications are completed in the same detail, give rise to identical needs for information or analysis (needs that could be met in identical time frames and with identical ease), and trigger only an identical set of concerns or questions.  Thus, even if it were clear that the agency processed some applications faster than others during this period, that fact, standing alone, could not support a finding that it was clearly unreasonable for the agency not to have made its decision about Ms. Razaq's application by the end of June, 2005.

---

[12]Each of petitioners' e-mails to the agency sets forth the filing date identified on the government's website of those I-130 petitions that the California Service Center branch was purportedly processing at that time.  Each of petitioners' e-mails sent through June 8, 2005, indicate that, according to the government's website, the agency was processing I-130 applications that had been filed *after* petitioner's by a margin of one to five months.

1    On this record, we simply can not find, as a matter of law, that it was clearly

2  unreasonable for the agency to take nine months to reach petitioner's application in

3  the queue of applications, to transfer that application to the appropriate investigatory

4  personnel, to conduct some level of investigation, to transfer the file to an

5  "adjudicating officer," to have the adjudicating officer reach this particular

6  application in his or her queue of cases and review the information resulting from the

7  investigation, and to have the adjudicating officer determine that this application

8  should be subjected to a more detailed review.

9    While we are neither positioned nor called upon to pass judgment on the merits

10 of the agency's determination that petitioner's I-130 application met the criteria for

11 detailed review, we note that the record the parties have developed to date would not

12 support a finding that this determination by the agency was unreasonable.  Mr. Razaq

13 had been deported two years earlier for overstaying a <u>ninety day</u> tourist visa by <u>five</u>

14 <u>years</u>.  Johnson Decl., at ¶7.  The fact that he overstayed his visa by such a significant

15 period would make it reasonable for the agency to inquire into whether he had

16 knowingly and intentionally violated the immigration laws.  Moreover, Holly Razaq's

17 I-130 was the second such application filed on behalf of Assad Razaq.  Given the fact

18 the agency was processing a second marriage-based I-130 application for the same

19 man, it would not be unreasonable for the agency to try to determine whether Mr.

20 Razaq's marriages were legitimate or were shams that were arranged in order for him

21 to re-gain admittance into this country.[13]

22    We shift our attention at this juncture to the second major time period in issue

23 here, the period that began in the latter part of June of 2005 and extends through most

24 of 2006.  It would be reasonable to infer from the record thus far developed that

25 sometime in the summer of 2005 the USCIS sent Ms. Razaq's file to the FBI for

26 investigation.  It also would be reasonable to infer that, between receipt of the file and

27 November 9, 2005, the FBI had conducted some investigation, identified additional

28

[13]We have no basis for concluding that Assad Razaq is doing so.  We simply note that the
suspicion would not be inaccessible to the agency.

16

information needed from petitioner, requested that information from Ms. Razaq, and received the requested information from her. See Gartland Decl., at Ex. C. (e-mail from Stacey Gartland to Christiana Knasiak, dated November 9, 2005). Assuming that the USCIS did not forward the file to the FBI until after June 9, 2005, the FBI conducted an initial investigation and then requested and received information from Ms. Razaq within approximately five months. Without more, we cannot find that the delay between June 9, 2005 and November 9, 2005, was <u>clearly</u> unreasonable.

On November 14, 2005, the USCIS informed petitioner that it could not take further action on the I-130 application "until review is complete and the file is released back to our office for adjudication." Gartland Decl., at Ex. C. One could rationally infer that, as of November 14, 2005, the FBI's review was not "complete" and that the FBI still possessed petitioner's file. An inference that the USCIS had possession of petitioner's file or had received input from the FBI that would permit the USCIS to move forward on petitioner's I-130 before November 14, 2005, is <u>inaccessible</u> on this record.

On December 29, 2005, petitioners' counsel sent an e-mail to the USCIS inquiring whether the file had been released back to the agency's office. Gartland Decl., at Ex. C. The record does not include a response by the USCIS to this e-mail. The fact that petitioners had not received notification that the FBI had concluded its investigation and released the file back to the USCIS before the end of 2005 provides at least some circumstantial evidence that those acts had not yet occurred. Accordingly, the evidence, viewed in the light most favorable to respondents, could permit an inference that petitioner's I-130 had not been returned to the USCIS, and, therefore, that that agency was not positioned to move forward on it, through the end of calendar year 2005.

What remains is the period between January and early August of 2006. This is the least transparent period we must assess. Petitioners have not identified for us the kind of information the FBI sought from them in the latter part of 2005 -- or at any other juncture. We do not know whether that information, perhaps assessed in the

17

1    context of other information the FBI deemed relevant, would reasonably have

2    triggered a need for some follow-up investigation by the Bureau.  We do not know

3    when the FBI completed any such follow-up investigation -- or when the FBI

4    returned the I-130 file to the USCIS.

5         What we do know about this period is that petitioners filed the complaint that

6    initiated these judicial proceedings on April 7, 2006, and that respondents filed their

7    answer on June 7, 2006.  In that answer, respondents asserted no fewer than three

8    times that "any delay in adjudication in this case is due in part to pending security

9    background checks."   While this statement does not identify the agency that was

10   conducting the security checks, one rationally accessible inference is that Ms. Razaq's

11   Form I-130 file remained with the FBI.  Thus, we cannot preclude the possibility that,

12   as of early June of 2006, the FBI had not completed its investigations and was not

13   satisfied that it could responsibly give the USCIS a green light to complete the

14   processing of Ms. Razaq's application.

15        We also know that on June 28, 2006, petitioners and respondents <u>jointly</u>

16   requested that the scheduled initial case management conference be postponed until

17   late August on the grounds that the "USCIS intends to interview the applicant for the

18   I-130 visa petition in early August, 2006," and that there was a "possibility that this

19   case may be administratively resolved in the next two months."  Stipulation to Extend

20   the Date of the Case Management Conference, filed June 28, 2006, at 2.  These

21   circumstances suggest that by late June, 2006, either the FBI had returned Ms.

22   Razaq's file to the USCIS or that that agency expected to receive the file soon -- thus

23   positioning the USCIS to re-institute its processing of the application.

24        Further, we know that the USCIS conducted its interview of Ms. Razaq on

25   August 14, 2006, that as a result of that interview the agency asked Ms. Razaq to

26   provide additional information, and that on August 15, 2006, the petitioners and the

27   respondents again jointly sought to have the initial case management conference

28   delayed, this time until September 29, 2006, as they perceived a "reasonable

probability that this case will be administratively resolved within the next 30 days."

18

Second Stipulation to Extend Date of Case Management Conference, filed August 16, 2006, at 2.  While that hope was not realized, it is clear that over the past few months the USCIS has committed real resources to this matter and has promised both petitioners and the Court that it will complete its adjudication by early February of this year.

While the evidentiary record the parties have provided enables us to sketch an outline of major events that occurred in this case between the late fall of 2005 and the summer of 2006, that record leaves a good many potentially relevant questions unanswered.  When did the petitioners' file reach the FBI and when did the FBI return it to USCIS?  What matters was the FBI investigating, what resources did it commit to this matter and when did it do so, and what were the contemporaneous competing demands on the FBI's time?

What are we to do, analytically, with these unknowns?   To answer that question, me must step back and remind ourselves about the context in which we are working.  Petitioners have moved for summary judgment.  It is their burden, under generally applicable principles, to establish that, under the undisputed facts, a rational trier of fact could reach only the conclusion that favors them.  That burden, which the law imposes on parties seeking summary judgment in any setting, is magnified in a case like ours, where fundamental constitutional principles permit the judiciary to invade a province of responsibility assigned to an equal branch of the federal government only when that branch has failed quite clearly to honor a duty that Congress has imposed on it.

The effect of these elemental and animating principles is to place a substantial burden on petitioners who seek a writ of mandamus directed at an agency of the executive branch.  Because of the location and size of that burden, a court may not base issuance of a writ on speculation, or on facts that are merely assumed or that are subject to genuine dispute.  Nor may a court base issuance of such a writ on one of two or more rationally accessible inferences -- even if the one seems appreciably more likely to be correct than the others.

1    With these directives in mind, we look again at the period between January and

2    August of 2006.  As noted above, we do not know what information the FBI had

3    developed or what its security concerns were.  Nor can we determine the role that

4    other pressing demands on the FBI's time might have played in extending the period

5    during which the FBI declined to return the file to the USCIS so that it could

6    complete the processing of the Razaq's Form I-130 application.

7    Given these circumstances, can we conclude that a rational trier of fact could

8    make only one finding about the length of the period over which the FBI apparently

9    retained the file and completed its investigations -- and that that finding is that that

10   period was clearly unreasonable?  We cannot so conclude.

11   It is well-known that since September of 2001, the FBI's resources have been

12   sorely taxed by the demands that have been made on it by the Administration.

13   Legitimate national security concerns, intensified by the sophistication of some of the

14   threats to the lives of people in this country, have forced federal agencies to be

15   considerably more careful and thorough in their investigations than they were in the

16   past.  In short, there was a lot more work for the FBI to do and it had to be done a lot

17   more carefully.

18   Moreover, we cannot say that it was unreasonable for the FBI (and the USCIS)

19   to infer from the circumstances that were most visible about this application that it

20   warranted an especially thorough work up.  Mr. Razad is a native of Kenya who had

21   become a citizen of the United Kingdom and who had entered the United States on a

22   90-day tourist visa in 1997 --  but he had remained in this country, illegally, for five

23   years -- until he was arrested and removed against his will.  He claimed, in a

24   relatively compact period, to have formed two separate relationships (with women

25   who were citizens of the United States) that would give him access to a permanent

26   visa.  After he was divorced and the first I-130 application on his behalf was

27   withdrawn, he had another woman submit a second application seeking the same

28   relief.  He claimed to have met that second woman (the current Mrs. Razaq) about the

time his first marriage was being dissolved -- but, somehow, to have been able to

1   advance that relationship from afar to the point where it led to a second marriage in

2   July of 2004.  That marriage was entered outside the United States.  Two months

3   later, his second U.S. citizen-wife submitted the second I-130 application on his

4   behalf.

5          The circumstances just described are sufficient to permit a rational trier of fact

6   to conclude that it was reasonable for the FBI and the USCIS to conclude that this

7   second Form I-130 application warranted an especially careful review and thorough

8   investigation.  The accessability to a rational mind of that conclusion clears a

9   pathway to a second finding that might rationally be made on the record before us:

10  that petitioner has failed to prove that the amount of time it has taken the executive

11  agencies to process this second application was clearly unreasonable.  The periods

12  involved, given the circumstances and what we know about the historical context,

13  simply are not long enough, standing alone, to compel the conclusion that the way the

14  federal agencies processed this second application was clearly unreasonable.

15         None of this is to suggest that the agencies have limitless time to investigate

16  and 'adjudicate' Form I-130 applications.  How much time it is reasonable to allot to

17  processing such applications will vary with the circumstances.[14]  As a general

18

19         [14]Courts evaluating the question of "unreasonable delay" where Congress has not
    specified a time frame for processing, sometimes consider the agency's "usual processing time"
20  for matters of the type at issue.  *E.g.*, *Luo*, 178 F.Supp.2d 1135 (C.D.Cal. 2001) (case is making
    its way through the usual channels slowly but is within the usual processing time); *Selah*, 367
21  F.Supp.2d 508 (case within usual processing time for such cases); *Galvey v. Howerton*, 503
    F.Supp. 35 (C.D. Cal. 1980) (operating instructions not law but provide a "yardstick" for
22  measuring reasonableness). The USCIS publishes an 'expected' time frame for processing I-130
    applications on its public website and referenced this time frame in the notice of receipt sent to
23  petitioners acknowledging the filing of Holly Razaq's I-130.  Gartland Decl., at Ex. A.
           Petitioners argue that the time taken by the USCIS to process Ms. Razaq's I-130
24  application is unreasonable because it is not consistent with the 'expected' time frame posted on
    the government's website.  *E.g.*, Gartland Decl., at Ex. B.  We are not persuaded by this
25  argument for several reasons.
           First, as noted in the text, all Form I-130 applications are different.  We cannot assume
26  that every application will require the same level of inquiry from the government.  The fact that
    the USCIS has completed processing a goodly number of applications filed after Ms. Razaq's
27  would not by itself support a finding that the detailed level of investigation the government has
    conducted into Ms. Razaq's application was unnecessary or inappropriate.
28         Second, the record supports a finding that once petitioner's I-130 was slated for "detailed
    review" the "usual processing time" no longer applied.  Gartland Decl., at Ex. C (June 9th e-
    mail: "We selected this case for detailed review and this will take longer than the normal
    processing time."  Emphasis added.).  Accordingly, as of the date the I-130 was designated for

1   proposition, that period would be appreciably shorter when the application is

2   straightforward and persuasively documented and where there is no situational reason

3   to question the good faith of the petitioners.  But even in more complicated

4   circumstances, like those presented by this case, at some point the length of the

5   period taken to process an application, by itself, will generate considerable

6   momentum in favor of a finding that the delay by the agencies is clearly

7   unreasonable.  The circumstances presented here approach that point.  When reached,

8   fairness would compel the court to shift the burden of persuasion to the government

9   and to issue the writ unless the government could show, by competent evidence that

10  speaks in detail to special circumstances and justifications, that a period that appears

11  presumptively excessive is not unreasonable.

12

13      **B.    <u>Respondents' Cross Motion</u>**

14      As previously stated, respondents ask us to find, as a matter of law, that the

15  government has acted *reasonably*.  This we cannot do.

16      It is respondents' burden to demonstrate that the evidence, considered in the

17  light most favorable to <u>petitioners</u>, demonstrates, as a matter of law, that the two year

18  _____

19  detailed review (no later than June 9, 2005), the relevance of the information on the
    government's website about processing time became questionable at best.

20      The USCIS's website information about processing time also is of limited utility for a
    third, independent reason.  Based on our review of the evidence, the date provided on the

21  website can change radically over time.  According to evidence in the record, in January 2005
    the agency was processing three month old I-130's; in March 2005 the agency was processing

22  one month old I-130's; in April 2006 the agency was processing six month old applications; as
    of December 5, 2006 the agency was processing applications that were <u>twenty one</u> months old;

23  and as of December 27, 2006, the agency was again processing six month old applications.  We
    point out that, inexplicably, the expected processing time posted on December 5, 2006, indicated

24  that the time to process had <u>regressed</u>.  (Petitioners submitted evidence that as of April 10, 2006,
    the USCIS was processing I-130's that had been filed on or before October 3, 2005.  On

25  December 5, 2006, nine months later, (when the Court's staff examined the public website) the
    website indicated that the USCIS was processing I-130's that had been filed on or before <u>March</u>

26  <u>16</u>, 2005 – i.e., the agency was processing petitions filed nearly seven month *before* October 3rd
    (the date given back in April 2006).  However, it also appears that twenty one days later, on

27  December 27, 2006, the agency's website stated that it was then processing applications filed on
    or before June 15, 2006.  We are aware of nothing in the record that would explain these

28  fluctuations.)  Because this "processing" date appears to be so motile, it is difficult to draw any
    solid conclusions based on the processing date that is published on any particular day.  For this
    reason, we find that the website processing time, even during the period prior to designation for
    "detailed review," is of limited reliability and, therefore, limited utility to our analysis.

1  delay in processing Holly Razaq's Form I-130 application is reasonable.

2  Consideration of the evidence in the light most favorable to *petitioners* makes

3  accessible a different set of inferences, and under those inferences the government

4  has failed to establish that the time it has taken was justified and reasonable, as a

5  matter of law.  Among other things, we note that the government has been processing

6  petitions filed <u>after</u> Holly Razaq's for almost two years now.  Viewing the evidence in

7  the light most favorable to petitioners, respondents have failed to present evidence of

8  <u>specific</u> justifications for that delay (such as backlog, competing priorities, etc).

9       Accordingly, we DENY respondents' cross motion for summary judgment.

10

11  **<u>CONCLUSION</u>**

12       For the reasons stated above, we DENY petitioner's Motion for Summary

13  Judgment and respondents' Cross Motion for Summary Judgment.

14  **By Wednesday, February 14, 2007**, the parties must file with the Court a joint

15  statement notifying the Court whether the government has completed adjudication of

16  Ms. Razaq's I-130 petition and, if so, committing to file papers dismissing the action

17  within thirty (30) days thereof.  If the government has not completed adjudication of

18  the petition, the parties also must file a joint case management conference statement.

19  **On February 21, 2007**, **at 1:30 p.m.,** the Court will conduct a case

20  management conference *unless,* by February 14th, the parties have notified the Court

21  that the government has completed adjudication of the I-130 petition.

22  IT IS SO ORDERED.

23  Dated: January 8, 2007

24           /s/  Wayne D. Brazil
         WAYNE D. BRAZIL

25           United States Magistrate Judge

Copies to:

26  parties, wdb stats

27

28

23